UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case: 1:26–cv–03269 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 9/15/2026
Description: Pro Se Gen. Civil (F–DECK)

PIERRE OLIVIER MICHEL DEGLAIRE, Plaintiff, pro se,

v.

**GOOGLE LLC; LINKEDIN CORPORATION; META PLATFORMS, INC.; OPENAI OPCO LLC; AMAZON.COM SERVICES LLC; MATCH GROUP, INC.; DRAFT2DIGITAL, LLC; NAMECHEAP, INC.; BOUYGUES TELECOM S.A.; EOS FRANCE S.A.S.; RAKUTEN KOBO INC.; KINSTA INC.; STRIPE, INC.; and JOHN DOES 1-50, Defendants.**

Case No. _______ (to be assigned)

Related case statement (LCvR 40.5): Deglaire v. BNP Paribas S.A. et al., No. 1:26-cv-2421 (D.D.C.), filed 8 July 2026.

# COMPLAINT

*Civil RICO (18 U.S.C. §§ 1962(c), 1962(d), 1964(c)); Computer Fraud and Abuse Act (18 U.S.C. § 1030(g)); 42 U.S.C. §§ 1985(2) and 1986; preservation and production of evidence*

**JURY TRIAL DEMANDED**

## I. NATURE OF THE ACTION

**1.** Plaintiff is aware that this Complaint is longer than most, and states the reason rather than leaving it to be inferred.

**2.** The conduct described spans nine years, more than eight countries, five legal systems and eight unrelated economic sectors. It is not a single transaction viewed from several angles. Plaintiff's case is that a course of conduct exists, and a course of conduct cannot be shown by an extract of itself: its extent in time, its geographic distribution and the diversity of the sectors it touches are not context surrounding the claim, they are the claim.

**3.** Plaintiff has accordingly applied three disciplines rather than shortening the account. Each paragraph states one dated fact and nothing else, without argument and without comment. Each is stated in the text of this Complaint and not by reference to exhibits, so that the Court need not sift material in order to find the claim. And the facts pleaded are those established by documents not emanating from Plaintiff: of the eighty-five mechanisms tabulated at Part VI bis, each is so established.

**4.** A litigant who has been subjected to a course of conduct of this duration and reach should not be required to abridge it to the dimensions of an ordinary dispute, and thereby to plead less than what occurred. Should the Court prefer a shorter statement upon any part of this Complaint, Plaintiff will provide it upon direction.

**5.** Plaintiff Pierre Olivier Michel Deglaire brings this action against thirteen Defendants. Twelve of the thirteen holders of records identified at Part VI are before this Court, two of them as entities of a single Defendant; the thirteenth holder is not joined, for the reason stated at paragraph 33. Two further Defendants, named at paragraphs 23 and 24, are not among those holders. The set described in this Complaint is accordingly not a sample of which a part is pursued: save for one, its whole is before this Court. He appears on his own behalf, without counsel.

**6.** This action is not about a refusal of data. It is about a result, and about what that result makes impossible.

**7.** Since 2017, each of Plaintiff's successive lawful business activities has been brought to an end. Eight of them, none in the same economic sector as the next. In the same years, and in eight countries, Plaintiff was twice deprived of his liberty and suffered episodes of abrupt deterioration of his health. In the same years, in five legal systems, no court has examined his case upon its merits, and in each the failure occurred at a different procedural stage and for a different stated reason.

**8.** Those matters are the subject of separate proceedings. They are pleaded here as facts and not as claims, because the conduct of these Defendants is unintelligible without them, and because a court asked whether a course of conduct exists cannot be shown one stratum of it.

**9.** This action concerns the most recent stratum, and the only one that forms a closed and finite set. Between 26 July and 14 August 2026, Plaintiff addressed written requests for access to thirteen identified holders of records concerning his accounts. Every one is bound, under the law applicable to it, to answer. As at the date of this

RECEIVED
SEP 15 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Complaint, not one has answered completely. Of the eleven in respect of which a statutory period ran, all eleven have expired. The mechanisms of non-answer differ from one holder to the next.

**10.** Ten different mechanisms producing one result is not what a common administrative cause looks like. A common cause produces a common mechanism.

**11.** Plaintiff seeks, first and above all, the preservation and the production of the records identified in this Complaint. He seeks damages, and he seeks them from a jury, but he pleads no sum: the quantification of loss cannot precede the production of the records that measure it, and Plaintiff will not ask this Court to assume what he has not been permitted to establish.

**12.** Plaintiff states what this Complaint will become. Those records, once produced, will identify which counterparties took an active part in the conduct described, and Plaintiff will then amend accordingly. He says so now rather than later, so that the Court knows the shape of what it is being asked to permit.

## II. PARTIES, AND THE IDENTIFICATION OF THE DEFENDANT ENTITIES

**13.** Plaintiff is a French national, born 13 January 1973, resident at 7 avenue Guillaume Apollinaire, 33700 Merignac, France. He is the sole custodian of the documentary record described at paragraph 14.

**14.** That record consists of approximately 350,000 electronic messages held in Plaintiff's professional account, of which approximately 139,000 have been isolated by objective criteria as the evidentiary corpus, together with approximately 2,500 files. No court and no institution holds a copy. Plaintiff first requested, in writing, a means of depositing it on 8 December 2025; no channel has been designated to this day.

**15.** Plaintiff has conducted proceedings in five legal systems without counsel. More than one hundred lawyers have been approached and none accepted the matter; in the United States, five law firms and twelve university clinics were approached between 14 and 23 July 2026, producing two refusals stated to rest on capacity and no assessment of the merits.

**16.** Plaintiff addresses the identification of the Defendant entities at the outset, because in several instances the correspondence in this matter was exchanged with a European establishment of the same group, and because this Court has previously required that a basis for jurisdiction over private actors be established.

**17.** Amazon.com Services LLC is a Delaware limited liability company with its principal place of business in Seattle, Washington. It operates the Kindle Direct Publishing service through which four of Plaintiff's works are distributed. Correspondence received on 14 and 15 August 2026 bears in its footer the names of Amazon EU Sarl, Amazon Europe Core Sarl and Amazon Media EU Sarl, Luxembourg, and the words "Amazon.com, Inc. or its affiliates". On 14 August 2026 one Amazon service wrote that its international websites operate independently of one another, while the footers of that message and of a message received nine hours earlier identify the same three legal persons.

**18.** Plaintiff further states a matter established by a public registry and not by any party. A connection to Plaintiff's electronic mailbox by the IMAP or POP3 protocol was recorded from Internet Protocol address 54.184.242.145. A lookup performed on the American Registry for Internet Numbers on 20 August 2026 returns block 54.184.0.0/14, netname AMAZO-ZPDX7, registrant Amazon.com, Inc., abuse contact at that company. A data centre is not a person: a connection of that kind is made by a program. Plaintiff does not allege that Amazon.com, Inc. or any Defendant made that connection, and states that a block allocated to a company is commonly leased to third parties. He states that the block is registered to a United States entity and that he has asked, and has not been told, who used it.

**19.** Google LLC has its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California. LinkedIn Corporation has its principal place of business at 1000 West Maude Avenue, Sunnyvale, California. Meta Platforms, Inc. has its principal place of business at 1 Hacker Way, Menlo Park, California. OpenAI OpCo LLC has its principal place of business in San Francisco, California. In each instance an Irish establishment of the same group appears in part of the correspondence. On 20 April 2026 Plaintiff addressed a written demand for preservation and production to Meta Platforms, Inc., Legal Department and Custodian of Records, 1 Meta Way, Menlo Park, California, in parallel with the Irish establishment; no reply has been received. On the same day he addressed a corresponding demand to Google LLC, Legal Department and Custodian of Records, 1600 Amphitheatre Parkway, Mountain View, California, under Google reference 5-4558000040548; no reply has been received.

**20.** Draft2Digital, LLC is an Oklahoma limited liability company, with its place of business at 11625 Custer Hill Boulevard, Suite 110, Oklahoma City, Oklahoma, and an aggregator of digital publishing distribution; it closed Plaintiff's account in May 2026. No question of the kind described at paragraphs 16 to 19 arises in its case: it is a United States entity, and Plaintiff's formal notice of 27 May 2026 and his claim of 11 August 2026 were addressed to it directly, at that address, the first to its General Counsel and Legal Department and the second to the Office of its Chief Executive Officer.

**21.** Match Group, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas. Two entities of that group hold records concerning Plaintiff and are separately identified in their own correspondence: MTCH Technology Services Ltd, Dublin, which operates the Tinder service, and Meetic S.A.S., Paris, RCS Paris 439 780 339. Plaintiff pleads them separately and does not conflate them: they are subject to different supervisory authorities. Plaintiff's request of 27 July 2026 to the first of them sought, among other things, the data exchanged with other entities of that group and in particular with the second. Each holds records within the categories described at Part VIII. Plaintiff seeks their preservation and production under Counts VI and VII, and nothing else from them.

**22.** Namecheap, Inc. is a corporation organised under the laws of the State of Arizona. It hosts Plaintiff's electronic mailboxes and domains. It furnished connection logs on 17 August 2026 without timestamps, declined to furnish the raw export of the logs of Plaintiff's own mailboxes, and has stated that its reception logs are retained for thirty days.

**23.** Bouygues Telecom S.A. is a company organised under the laws of France. Plaintiff pleads against it conduct which occurred within this forum: between 5 and 12 December 2025, while Plaintiff was present in New York for the purpose of filing before the federal courts, the mobile service it supplied to him ceased entirely, including emergency calls and data roaming, and it was that failure which caused the night described at paragraph 48. It had written to Plaintiff on 7 August 2025 acknowledging an attack permitting unauthorised access to his civil-status data, contractual data and bank account identifier, and has answered nothing since, notwithstanding requests of 7 August and 24 October 2025.

**24.** EOS France S.A.S. is a company organised under the laws of France, with its address at 19 allee du Chateau Blanc, 59290 Wasquehal. It pursues recovery, for the account of the Defendant named at paragraph 23, of sums said to arise under a contract extinguished by operation of law upon the porting of Plaintiff's telephone number. Seven documents issued by it state two different characterisations of the same sum. Plaintiff has contested the claim in its entirety, has exercised his right to object to the processing of his data and to obtain its restriction, and has received no substantive answer to either.

**25.** Rakuten Kobo Inc. is a company organised under the laws of Canada, with its registered office at Toronto, Ontario. It distributes Plaintiff's works in the United States. It is one of the channels which the Defendant named at paragraph 20 stated had declined that content, and it published those works upon review. Kinsta Inc. is a company with its place of business at West Hollywood, California; its own published privacy policy identifies it alongside Kinsta Ltd, of the United Kingdom, and a further entity established in Hungary. It hosts Plaintiff's website and has made no response of any kind since 27 July 2026.

**26.** Stripe, Inc. is a Delaware corporation with its principal place of business in South San Francisco, California; its correspondence identifies Stripe Payments Europe Ltd and Stripe Technology Europe Ltd, Dublin, within the same messages. It processes payments for the works and other products Plaintiff offers. On 26 July 2026 Plaintiff asked it, item by item, for a complete record of every payment attempt associated with his account since its creation, including declined card payments, transactions blocked by a risk or fraud control, failed authentications, and abandoned or errored payment intents, stating for each the date, the amount, the reason code and the party that took the decision; and whether his account had at any time been placed under review, restricted, flagged or rate-limited. The period expired on 26 August 2026 without any extension being notified, and no answer to those items has been given.

**27.** Plaintiff does not allege that any purchase was prevented. He states that he does not know whether any purchaser presented himself, and that the only person able to say is the Defendant which holds the record and has not produced it.

**28.** Plaintiff further identifies holders of records who are not named as Defendants and against whom no claim is made: Anthropic PBC. Each holds records within the categories described at Part VIII. Plaintiff seeks their preservation and production under Counts VI and VII, and nothing else from them.

**29.** Plaintiff names, for each group, both the United States entity and the European establishment which appears in the correspondence, and does not ask the Court to disregard any corporate form. He pleads that personal jurisdiction over each lies under 18 U.S.C. § 1965, which provides for nationwide service of process in civil actions under that chapter and has been understood to found jurisdiction upon contacts with the United States as a whole, subject to the Fifth Amendment; and, as to any Defendant not amenable to suit in the courts of any State, under Rule 4(k)(2) of the Federal Rules of Civil Procedure. He pleads in addition that each United States entity is answerable for its own conduct in determining or applying the retention policies, the access-request procedures and the security-record architecture applied to his accounts: a parent that itself participates in and controls the operation concerned is directly liable for its own actions, without regard to the separateness of its subsidiary, United States v. Bestfoods, 524 U.S. 51, 64-65 (1998).

**30.** Plaintiff pleads two matters in support, each established by a document not emanating from him. First, on 19 March 2026 LinkedIn declined a request on the stated ground that it would require valid legal process enforceable in the United States, and Plaintiff's notice of 21 March 2026 was accordingly addressed to LinkedIn Corporation, Legal Department, Sunnyvale, California. Second, the matters pleaded at paragraphs 145 and 146 below, concerning transmission to the parent company.

**31.** Plaintiff makes no allegation as to which entity within any group made any particular decision, and reserves the right to join any European establishment of any Defendant.

**32.** Defendants John Does 1-50 are persons or entities, presently unidentified, who directed or facilitated the conduct described below, and whose identities Plaintiff expects to ascertain through discovery. They are the same persons as those so designated in No. 1:26-cv-2421. Plaintiff makes no allegation as to their identity and does not speculate upon it.

**33.** Anthropic PBC is not a Defendant and will not be joined. Plaintiff states this so that its absence is not read as an oversight.

## III. JURISDICTION AND VENUE

**34.** This Court has subject-matter jurisdiction under 28 U.S.C. § 1331. The claims arise under 18 U.S.C. §§ 1962 and 1964, 18 U.S.C. § 1030, and 42 U.S.C. §§ 1985 and 1986.

**35.** No foreign state is named as a Defendant, and Plaintiff invokes no exception to the Foreign Sovereign Immunities Act. Each Defendant is a United States entity.

**36.** Venue and personal jurisdiction lie under 18 U.S.C. § 1965, which provides for nationwide service of process in civil RICO actions. Venue is also proper under 28 U.S.C. § 1391(b)(2).

**37.** Personal jurisdiction additionally lies under the effects test of Calder v. Jones, 465 U.S. 783 (1984). From 11 August 2026 in respect of four Defendants, and from 13 September 2026 in respect of the remainder, each Defendant held a written communication from Plaintiff identifying by case number the proceedings pending before this Court in No. 1:26-cv-2421, before the United States Court of Appeals for the District of Columbia Circuit in No. 26-7083, and before the United States District Court for the Southern District of New York in No. 1:25-cv-10163-LTS, and identifying the records said to bear upon them.

**38.** Plaintiff's requests and notices were addressed from a number of countries, and a substantial part of them from outside France. What connects that correspondence to this forum is not the place from which it was sent but what it identified: proceedings pending before the federal courts of the United States, named by their case numbers, and the records said to bear upon them.

**39.** Plaintiff pleads one further matter as to the domestic character of the effects, and it concerns their object rather than their consequence. The conduct set out at Part IV required, in order to be carried out, prior knowledge of which items to affect and of when a journey was to take place, and that knowledge existed in the systems these Defendants operate. What was affected was situated within the United States.

**40.** Registered items delivered against signature at Washington produced no entry upon any docket and no notified ground of rejection. A written notice of 15 March 2026 identifying the proceedings then pending, addressed to a federal agency and sent in copy to the clerks' offices at Washington and at New York, produced no acknowledgment; it was the sixth of seven written communications addressed to that agency between December 2025 and April 2026, none of which has been acknowledged. Four communications sent on 25 April 2026 were

rejected by the receiving servers. And mobile communications ceased entirely in New York during a federal filing. The effect is accordingly domestic not only in its consequence but in its object.

**41.** Plaintiff's injury is domestic within the meaning of RJR Nabisco, Inc. v. European Community, 579 U.S. 325 (2016), as clarified in Yegiazaryan v. Smagin, 599 U.S. 533 (2023): the impairment of Plaintiff's ability to prosecute proceedings before the federal courts of the United States, together with the destruction of a publishing activity whose distribution channels, payment processing and market are situated in the United States.

## IV. THE FRAMEWORK OF FACT

### A. The digital perimeter

**42.** Plaintiff conducts the whole of his affairs by electronic means. His case files are drafted and stored on online systems. His registered postal items are ordered and paid for online, and their confirmations and tracking numbers reach him by electronic mail. His appointments and journeys are recorded in those systems before they occur. Each of the matters set out below presupposes knowledge of one of those things: which item to affect, that a journey was to take place, that a written request had been sent, where Plaintiff would be on a given night.

**43.** Plaintiff states one further observation, and states it as an observation only. The occasions on which he leaves that perimeter are the occasions on which he has observed physical surveillance: in Bulgaria, Turkey and Serbia in August 2022, upon leaving France after wealth-management accounts had been refused; in Paris in February 2025, when delivering documents to opposition parties and meeting a lawyer; near the Swiss border in August 2025, when meeting clients; in Switzerland in September 2025, when delivering documents to a United Nations institution and meeting an international firm; and in London in November 2025 and New York in December 2025, when effecting filings. He has observed none on a working day at his desk. He asserts no identity and no affiliation.

### B. One week: 4 to 12 December 2025

**44.** Plaintiff sets out this week first, and separately, because it occurred in the United States, because every element of it is dated, and because it can be understood without reference to the years that precede it.

**45.** Plaintiff prepared this journey without using his usual means of communication. He was therefore unable to book in advance, to verify the entry formalities, or to arrange his arrival. He left his home at about two o'clock in the morning and drove approximately six hundred kilometres to Barcelona, having decided not to depart from a French airport following the matter described at paragraph 71 below.

**46.** On the afternoon of Thursday 4 December 2025 Plaintiff attended the Consulate General of France in Barcelona to deposit the case file. He was received on the pavement outside by a local liaison officer, who observed that it was the eve of the weekend, that no one was available, and that it would be preferable for Plaintiff to deposit the document in the United States. The Consulate did not accept the documents.

**47.** Plaintiff then discovered that a United States travel authorisation was required, of which he had not been aware. The application did not complete. His network connection was slow. He could not travel that day and spent the night in Barcelona. He flew on Friday 5 December 2025, departing in the morning and arriving late.

**48.** Plaintiff reached the square adjoining the federal building at about one o'clock in the morning on Saturday 6 December 2025. His mobile telephone had no service. He had attempted, at John F. Kennedy airport, to obtain service from an operator present in the terminal: two cards of different technologies were offered, neither of which the operator was able to configure, and neither was therefore purchased. The only connection available to him was a public access point covering a few dozen metres. He did not make payments online and did not wish to signal his position before he had delivered his case file to the Federal Bureau of Investigation and to a court. He remained outside that night, in sub-zero temperatures. A local police service, to which he had applied for assistance in view of a risk to his safety in travelling to the court, directed him to the Federal Bureau of Investigation.

**49.** On Saturday 6 December 2025 Plaintiff presented himself at that agency; the offices were closed. He returned on Sunday 7 December 2025; the offices were closed.

**50.** On Monday 8 December 2025 Plaintiff waited outside for approximately three hours, in temperatures of minus five to minus ten degrees, before being admitted. He was then interviewed successively by security personnel, by a supervisor, by a further person, and finally by two analysts who heard him for some minutes. He was permitted to

show documents but not to hand them over. He therefore took the case file to the post office situated within the same federal building and dispatched it from there, by tracked mail, to the agency whose offices he had just left. It was received on 9 December 2025 and an electronic acknowledgment was issued.

**51.** On the same day, 8 December 2025, Plaintiff filed his case file with the United States District Court for the Southern District of New York, requesting that it be transmitted to Washington.

**52.** During the same week Plaintiff addressed communications, from New York, to recipients belonging to fields unrelated to one another: several dozen investment funds, litigation funders and sovereign funds; seven or eight major newspapers with a physical presence in the city; the National Security Council, through its official form; a Senator for the State of New York, and parliamentary channels. He also attended in person at the offices of one funder, without an appointment, and did not obtain access. Certain of those communications were sent from a public access point distinct from his usual means.

**53.** One reply was received, from a funder, stating that Plaintiff did not fall within the range it had selected. Plaintiff does not allege that any of those communications failed to reach its recipient, and does not characterise the absence of reply.

**54.** During that same week Plaintiff's laptop computer exhibited severe slowdowns and at least one major system failure, including at times when no application was connected to any network, and while he was preparing documents and attempting to communicate. In the same period, at hours when few pedestrians were present, he observed individuals positioned in his immediate vicinity at moments of technical disruption, appearing singly and in sequence at different points along his routes. He asserts no identity and no affiliation, and states the simultaneity as an observation.

**55.** Plaintiff's mobile service functioned normally in Spain on the outward journey and in Germany on his return, and resumed upon his arrival there. It did not function in the United States at any time during that week, notwithstanding the two cards described at paragraph 48, neither of which could be configured.

**56.** Between 18 and 27 November 2025, while travelling by road at night between Dover and London in order to effect a filing, the same total loss of service had occurred, including emergency calls and data roaming.

**C. Professional background**

**57.** Plaintiff sets out the following because the account which follows concerns eight activities each of which was brought to an end, and because the Court is entitled to know what preceded them.

**58.** Plaintiff has more than thirty years of professional experience in banking, financial markets, wealth management, real estate and business development. His career began in the financial sector, within internationally recognised institutions, where he progressively assumed positions of increasing responsibility. He was promoted on each occasion, upon results which increased year on year.

**59.** In parallel with that career he conducted real-estate transactions on his own account. Three in Paris between 1999 and 2003, upon apartments, each producing a net profit of between 75,000 and 150,000 euros. Three at Biarritz and in its region between 2007 and 2013, producing respectively a net profit of approximately 900,000 euros, approximately 700,000 euros, and approximately 400,000 euros, the last being the resale of land at a gain exceeding fifty per cent in under two years.

**60.** Six transactions carried to completion. All positive, without exception. Approximately two million euros over the period. A seventh, conducted in the circumstances described at paragraph 66, produced the opposite result in a market which had doubled. Plaintiff states that for completeness and draws no conclusion from it.

**61.** Plaintiff pleads those matters for one purpose. What follows is a sequence of eight activities each of which failed. Whether that sequence is explained by the person who conducted them or by something else is a question the Court will decide, and Plaintiff sets out both sides of it rather than only the second.

**D. Eight successive activities**

**62.** Between 2017 and 2026, eight successive and unrelated lawful activities of Plaintiff were brought to an end: a group of seven real-estate agencies employing up to forty people; a financing-brokerage activity; a property-dismemberment activity; a banking model prepared over several years and presented to, and positively received

by, the Chief Economist of the Bank of Lithuania; a modular-housing project; three contractual relationships concluded in Dubai in 2025; and the publishing and creative ecosystem described below.

**63.** The insolvency of the agency group was opened in 2017 and 2018. It is not closed nine years later, it remains contested, and it has never been examined upon its merits by any court. Plaintiff brought fresh proceedings in France in 2026 for that reason.

**64.** As to the dismemberment activity: in June 2022 a bank-owned fund's investment committee validated eight purchase offers totalling approximately 75 million euros. Weeks later a French banking institution refused to open the dedicated account on which execution depended. That refusal came first and made execution impossible; it was not the determining cause of the cessation.

**65.** The determining cause was that, in August 2022, Plaintiff was deprived of his liberty in Serbia, and that upon his return he was subjected in France to involuntary hospitalisation contrary to the decision of the Serbian court. The irregularity of both measures is established by documents obtained in 2026 from the files themselves, and both are contested before the investigating judge of the Tribunal judiciaire de Paris under reference 26/923. None of the eight validated transactions was completed.

**66.** Plaintiff is careful as to what he seeks from the foregoing. He does not seek damages for the deprivation of his liberty or for any consequence of it upon his person. What he pleads as injury to business or property within the meaning of 18 U.S.C. § 1964(c) is the termination of an existing commercial activity, which is a property interest, and the two measures are pleaded as the mechanism by which it was terminated and not as the injury.

**E. Physical integrity, pleaded as context and continuity**

**67.** Plaintiff pleads the following as context, gravity and continuity. He does not plead them as heads of loss and seeks no damages for them in this action.

**68.** Serbia, August to September 2022: a deprivation of liberty of the order of thirty-seven to thirty-eight days, from about 14 August to about 22 September, the exact dates remaining to be confirmed from the prison records which Plaintiff holds, and a memorandum filed abroad stating forty days, a discrepancy Plaintiff reports rather than omits; a period of six hours to appeal; a notification-of-rights form recording that a translator for English was designated for want of a judicial interpreter, which form is unsigned; a video recording on the file never viewed and to which Plaintiff never had access.

**69.** France, September to October 2022: involuntary hospitalisation upon return, contrary to the decision of the Serbian court, upon a certificate dated 17 August 2022 written at a distance by a physician who had not seen Plaintiff for months.

**70.** Luxembourg on 28 March 2024: symptoms never previously experienced, which appeared on stepping out of a taxi, before entering the restaurant and before any meal, and of which Plaintiff informed his mother and his brother by message within minutes, with his location. Dubai in 2025, in the same hotel on two stays: on the second, of forty-four consecutive nights in a single room, continuous respiratory symptoms present in the room and markedly reduced away from the hotel, resolving after a deep cleaning of that room requested on 13 July 2025. Tbilisi on 11 March 2026 and Dubai on the night of 22 to 23 May 2026: unsolicited physical contact initiated by an unknown third party. The Tbilisi episode was followed some seventy-two hours later by acute pancreatitis; Plaintiff states, rather than omits, that he had one such episode more than thirteen years earlier following spinal surgery and antibiotic treatment, and none since. In March 2025 a main coronary artery was found entirely obstructed and a stent was placed.

**71.** Roissy, night of 20 to 21 June 2025: a departure decided the same day, a ticket purchased that day, no person informed other than Plaintiff's parents. During the night an unknown person took hold of both of Plaintiff's hands in the terminal. The following morning, at the security control, explosive-trace detection tests were positive on his hands. The test was repeated, the consumables were changed, the machine was changed, and the result remained positive. It was also positive upon a tablet computer which had remained in his bag during that contact and which he handled only afterwards. Those findings were made by agents of the French State, on French territory, on a certain date.

**72.** Plaintiff states one matter as to the whole of this section. Each of the events set out above required, in order to be carried out, prior knowledge of a journey, a place, a time or a duration. Plaintiff does not claim to know how that knowledge was acquired. He states that he conducts the entirety of his affairs by electronic means, that those

elements appeared nowhere else, and that in the case of 20 June 2025 the only trace preceding his arrival at the airport was the purchase of a ticket two hours earlier. He adds that a deployment of several dozen persons in a determined place is not improvised.

**73.** Two events affected motor vehicles, and they are distinct. On 21 March 2024, in Paris, between two meetings with press organisations, the fuel gauge of the vehicle Plaintiff was using was found to have risen although no fuel had been added, and the vehicle began to behave abnormally; on 22 March 2024, on the motorway, in the left lane while overtaking, its engine imploded and its gearbox was destroyed. The garage that towed it never provided any diagnosis. On or about 4 September 2025, returning from Geneva after delivering documents to a United Nations institution and meeting a Swiss lawyer, a second vehicle lost grip on every thin film of water over the first two hundred kilometres, and then, on a dry carriageway, on a motorway link road in a bend at about eighty kilometres per hour, rotated approximately five hundred and forty degrees and struck a concrete parapet. That vehicle has never been repaired and remains available for expert examination. Plaintiff states, rather than omits, that no insurance declaration was made, that its tyres have since been replaced, and that he cannot situate the exact location.

**F. Access to justice**

**74.** In each of the five legal systems seised, the matter has failed to proceed, and never by the same mechanism. Plaintiff pleads the following United States matters, each established by a document issued by a federal agency or a court and not by him.

**75.** Records obtained under the Freedom of Information Act from the United States Postal Service, transmitted on 21 August 2026 under file 2026-FPRO-03106 and signed by the Director of Product Tracking, establish delivery against signature of registered items addressed to 333 Constitution Avenue N.W. on 12 November 2025 at 13:16, on 14 November 2025, on 18 November 2025, and on 15 December 2025 at 15:08. Each attestation bears a recipient-signature box which is completed. No entry followed on any docket available to Plaintiff, and no ground of rejection was notified to him. He learned of those deliveries nine months after the event, from a federal agency and not from a court.

**76.** The same records show three items recorded under a code denoting no access to the delivery location, in federal buildings during business hours on a Tuesday, a Wednesday and a Monday; one item recorded at a Dallas, Texas facility on 2 August 2026 and at a Warrendale, Pennsylvania facility on 6 and 7 August 2026, fourteen days after its arrival in the Washington area; and two items delivered to a caller service or general delivery point rather than to the street address stated upon them. Plaintiff pleads these matters as a question of the integrity of the records, and not as a complaint about the delivery of mail.

**77.** Plaintiff states expressly, and corrects his own earlier description accordingly, that these items were delivered. A document he filed in November 2025 stated that registered items had not reached their destination; the records now obtained establish that several were delivered against signature. The difficulty concerns their registration and not their delivery. Plaintiff draws no conclusion from this and imputes nothing to any person.

**78.** On 13 January 2026 Plaintiff's file was transferred from the Southern District of New York to this District, the applicable waiting period being expressly lifted by reason of the urgency invoked. It was received and numbered in this District on 11 June 2026, one hundred and forty-nine days later. On or about 1 June 2026 the Clerk's Office of this Court stated in writing that it had no record of the case.

**79.** A United Kingdom authority stated, over a period of months, that it held no record of items Plaintiff had sent. It later wrote, approximately eight months after despatch, that those items had been received. A further United Kingdom ministry stated on 25 August 2026, after what it described as a thorough search, that it held no data concerning two urgent applications made on 26 November 2025.

**80.** Plaintiff further states that he has sought, from the authorities holding them, the records bearing upon the episodes of surveillance described at paragraph 43, and has obtained none. He applied to the Commission for the Control of Interpol's Files, which registered his request and has not answered it. He applied to the French Ministry of the Interior, which has not answered. He applied to the Ministry for Europe and Foreign Affairs for the consular record concerning him, and has not obtained it. He applied for access to the national files in which such records are held, and has obtained no substantive answer. Plaintiff pleads those matters as facts and imputes nothing to any of those authorities.

**81.** Plaintiff further pleads the following, which concerns the Defendant named at paragraph 24. It pursues recovery against him, monthly, of a sum said to arise under the contract referred to at paragraph 23, which was extinguished by operation of law upon the porting of Plaintiff's telephone number. Seven documents issued by it state two different characterisations of the same sum. Plaintiff cannot verify the claim, the records upon which it rests being held by the Defendant named at paragraph 23 and not having been produced. He pleads this as one of the matters by which his means of conducting the proceedings described in this Part have been reduced.

**82.** Plaintiff has since addressed ten written communications to the agency described at paragraph 50. No decision has been notified to him, and on 27 August 2026 he filed an action in the nature of mandamus in this District to compel one.

**G. What the framework establishes, and what it does not**

**83.** Plaintiff alleges no agreement among any of the persons involved in the foregoing, and imputes no intention to any individual. He alleges that hundreds of facts bearing no relation to one another have produced one effect, upon one person, without interruption, across time, geography, economic sectors and instruments. That convergence is itself the fact pleaded.

**84.** Plaintiff sets out the following, which is established by the internal records of a United Kingdom financial regulator, disclosed to him on 28 August 2026 in answer to a request for access to his own data. On 10 July 2026 at 09:55, five days before that regulator declined to take the matter further, an internal message described his submission as alleging abuses under the first and second chapter prohibitions against a number of French banking institutions together with entities in the United Kingdom, concerning the refusal of a dominant undertaking to supply the banking access and financing required to enter a market. On 16 July 2026 at 12:35, the day after the refusal, a further internal message stated that the author suspected Plaintiff might return, asked to be informed if he did, and described his complaint as sophisticated from the standpoint of competition law. On 30 July 2026 at 15:04 the question whether Plaintiff should be treated as a whistleblower was referred internally; the reply at 15:49 stops in the middle of a sentence and no exemption is cited for the part withheld.

**85.** The same disclosure reproduces Plaintiff's submission form of 7 July 2026 together with its two recorded attachments. A separate authority had written on 29 June 2026 that those annexes were absent from his email.

**86.** Records furnished by that regulator on 25 August 2026 state that it received three such third-party reports in the financial year 2024 to 2025 and nine in 2025 to 2026; that no formal investigation was opened in either year; that one and then two were closed by reference to its prioritisation framework; and that on no occasion did it inform or consult the concurrent competition authority in respect of a matter it had decided not to prioritise. It adds that it would not typically do so. The same response states that its retention period for third-party reports of suspected infringements, and for its internal records of decisions not to prioritise, is ten years from case closure.

**87.** On 20 July 2026 the competition directorate of the European Commission wrote to Plaintiff, over the signature of a head of unit, summarising his submission in its own terms: that the banking establishment he intended to submit for authorisation could not be realised for want of the prudential capital required, and that he invoked, first, the impossibility of recovering archival and communications-history data in order to document his approaches to credit institutions and economic partners, and second, refusals of financing. It recorded the information and stated that material from different sources may constitute a body of indications capable of leading it to undertake an examination at a later stage.

**88.** Plaintiff pleads those matters for one purpose. Two authorities, in two legal orders, have each described this matter in their own words, and one of them has itself connected the impediment to his access to records with the failure of his entry to a market. Neither has opened an investigation. Plaintiff draws no conclusion and asks this Court to draw none.

**89.** Two matters within the framework are stated by others. On 16 July 2026 the United Kingdom financial regulator recorded internally that Plaintiff's complaint was sophisticated from the standpoint of competition law; twelve third-party reports were received over two financial years, no formal investigation was opened, and three were closed on prioritisation grounds. On 4 September 2026 the Competition and Markets Authority wrote that it was partially upholding Plaintiff's complaint and abandoned the ground on which its initial refusal had rested.

## V. THE ENTERPRISE

**90.** The enterprise alleged is an association in fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants John Does 1-50, who direct it, together with the named Defendants, who participate in it or serve as its instruments.

**91.** The common purpose is not an interest shared among the Defendants. It is a result: to prevent Plaintiff from creating value in any activity he undertakes, and in particular to prevent the entry to market of the banking model received favourably by a public institution; and to prevent him from establishing that fact before any tribunal.

**92.** That purpose is not abstract. It is concrete, negative and verifiable, and it is verifiable eight times over, by reference to the eight activities identified at paragraph 62.

**93.** Plaintiff does not allege a horizontal association among competitors, and does not allege that any Defendant communicated with any other. Several of the named Defendants are direct competitors of one another. The association pleaded is vertical: each Defendant is connected to the direction of the enterprise, and not to the others.

**94.** The continuity and relatedness required by H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), are established by the record. The conduct spans from 2017 to the date of this Complaint and has not been interrupted.

**95.** Plaintiff pleads that the enterprise functions as a continuing unit within the meaning of Boyle v. United States, 556 U.S. 938 (2009). He does not rely upon parallel conduct alone. He identifies five matters, of which three are material facts recorded in documents not emanating from him — the single external address appearing in the records of two independent undertakings, the coincidence of dates of 15 April 2026, and the prior knowledge that any selective targeting requires — and two are characteristics of the conduct itself.

**96.** First, a single Internet Protocol address, 203.23.178.77, appears in the security records of two independent and competing undertakings, LinkedIn and Google, in respect of Plaintiff's accounts, on 4 December 2025 and on 21 and 22 February 2026 respectively. Plaintiff draws no conclusion as to its holder. He states that the same external point of access appears in the records of two undertakings that have no relation to one another, and that it appears in their own files.

**97.** Second, conduct contrary to the actor's own interest. A service provider that declines a lawful request from a paying customer, thereby exposing itself to its supervisory authority, gains nothing by doing so. No commercial explanation has been offered by any Defendant, and Plaintiff has asked each of them.

**98.** Third, synchronicity across sectors that have no connection. Between 2017 and 2026, in eight countries, events affecting Plaintiff's physical integrity, his economic activities, his electronic accounts and his access to courts occurred in overlapping periods. The sectors are unrelated. Their calendar is not.

**99.** Fourth, and this matter Plaintiff states with particular care because it bears upon why these Defendants are before this Court rather than others. Plaintiff conducts the whole of his affairs by electronic means. His registered postal items are ordered online, paid for online, and their confirmations and tracking numbers are received by electronic mail; the documents they contain are drafted and stored on online systems; and his correspondence with registries passes through the same systems. A course of conduct that affects certain of those items and not others requires knowledge, in advance, of which items to affect. That knowledge exists in the systems identified in this Complaint and, so far as Plaintiff is aware, nowhere else. Plaintiff adds one matter which bears upon that. He has travelled continuously: he was outside France from 2 January to 27 June 2026, in France from 27 June to 24 August 2026, and outside France since. His accounts have accordingly been used from a large number of countries, and the record of where he was, and when, exists in those systems and in no other place.

**100.** Fifth, a coincidence of dates in the conduct of two independent undertakings. Plaintiff made parallel written submissions to two Defendants in March 2026. Each remained silent for a comparable period. On 15 April 2026 both replied, on the same day, and each reply consisted of links to self-service material and did not address the substance submitted. Plaintiff makes no assertion as to the cause of that coincidence. He states it as a dated fact appearing in the correspondence of both undertakings.

**101.** Plaintiff anticipates the observation that the only matter common to these Defendants is that each answered the same person inadequately, and states why that is not what he pleads. Three of the matters set out above are

not modes of answering at all: an external address appearing in the files of two competing undertakings is not a manner of replying; a coincidence of dates between two independent undertakings is not a manner of replying; and the prior knowledge that selective targeting requires is not a manner of replying. Nor is the matter pleaded at Part IV, which concerns events in eight countries over nine years and in which the greater number of the actors are not parties to this action.

**102.** Plaintiff does not allege that any Defendant communicated that information to any person. He alleges that he has asked each Defendant to identify the recipients of his data, as he is entitled to do, and that no Defendant has identified any recipient otherwise than by category. Whether such communication occurred is a question that only the Defendants can answer, and it is among the matters for which production is sought.

## VI. THE CLOSED SET: THIRTEEN HOLDERS, ONE RESULT

**103.** Between 26 July and 14 August 2026 Plaintiff addressed written requests for access to thirteen providers of digital services, under Article 15 of Regulation (EU) 2016/679 where applicable and under the providers' own published procedures otherwise. Each request identified the account, the period and the categories sought. Each was acknowledged.

**104.** As at the date of this Complaint, none has been answered completely. Eleven statutory periods have expired. Two extensions were notified after the period they purported to extend had already run.

**105.** Plaintiff sets out the mechanisms without characterising them. He does not allege that any was coordinated with any other. He alleges that they are ten different mechanisms producing one result. The providers referred to in the paragraphs which follow are those named at Part II, save for the one identified at paragraph 33; Plaintiff describes each mechanism rather than naming its author, because it is the diversity of the mechanisms and not the identity of any one provider that he pleads.

**106.** One provider requalified the request on 22 July 2026 as a hacking incident said not to be covered by data-protection legislation; declined it on 28 July on the ground that its officer had not been seized; and, upon a fresh request made on 29 July to that officer with a passport enclosed, closed the resulting ticket on 21 August 2026 on the stated ground that no profile could be located for the electronic address in question.

**107.** One provider furnished an export covering twenty-seven days, with the location fields empty throughout.

**108.** One provider published two addresses for its data protection officer, both of which returned a hard delivery failure stating that the account does not exist, the first on 30 July 2026 and the second on 13 September 2026, the latter on the very day a notice to preserve was sent. That provider is the only one of the thirteen to have announced in writing a deletion of data while a request for access was pending.

**109.** One provider opened four separate file numbers for a single request.

**110.** One provider, on 8 August 2026 at 04:00, declared the request completed and announced that the data would be available for ninety days. The link does not resolve; the failure occurs after a successful two-factor authentication and the procedure loops on the same error. In the course of seventeen days that provider routed a single request through nine distinct channels and five file numbers, and on 4 August 2026 it recorded in writing that Plaintiff's identity had been verified.

**111.** One provider allowed the period to expire on 26 August 2026 without notifying any extension, and has neither confirmed nor refused, on any of five occasions on which it was asked, a restriction of processing.

**112.** One provider furnished connection logs on 17 August 2026 without timestamps, and declined to furnish the raw export of the logs of Plaintiff's own mailboxes on stated grounds of confidentiality and security.

**113.** One provider has not responded at all.

**114.** One provider closed Plaintiff's publishing account in May 2026, giving within ninety-six hours four grounds of refusal that cannot stand together, one of which was that thirteen distribution channels had declined the content. That statement is demonstrably false: the same works are published under the same ISBN by Apple, Google, Amazon and Kobo. One of the channels that provider named, Kobo, first declined the works and then, upon review, published them. In the same sequence that provider refunded, unrequested, an activation fee which its own terms state to be non-refundable. A formal claim stating a period of twenty-one days was addressed on 11 August 2026;

that period expired on 1 September 2026 and no answer has been received. Plaintiff states the fact of that claim and its date only, and does not set out its terms.

**115.** On 13 September 2026 Plaintiff addressed to one provider a notice to preserve records, sent to its legal department and to its data protection officer. Within eleven minutes three replies were received from a retail customer-support address: two identical in their terms, and a third responding to an enquiry as to how books may be published, which Plaintiff had not made. None addresses preservation. The third reproduces Plaintiff's letter in full.

**116.** That same day, a further provider acknowledged receipt of an identical notice, under a ticket number and without objection of any kind, in respect of an account which it had itself closed in May 2026. It did not state that it held no records.

**117.** Plaintiff has, in the same period, received from a Belgian bank a response to a request of the same nature which named the systems searched, including the professional mailboxes of its staff, and stated the four search keys used with their values. He pleads that fact for one purpose only: to establish that what is described above is not what compliance with a request of this kind looks like.

## VI bis. MANY MECHANISMS, ONE RESULT

**118.** For the purposes of this Complaint, Plaintiff has tabulated every distinct mechanism by which a lawful step of his was defeated, in each of the four fields in which his affairs have been conducted since 2017. Eighty-five such mechanisms are recorded. Each of them is established by a document identified in that table, and none rests upon Plaintiff's own assertion alone.

**119.** The Schedule referred to above is annexed. It is a single table of eighty-five rows, one row to each mechanism, and it carries no argument and no conclusion. Each row states the field, the date or period, the actor or channel concerned, the mechanism recorded, the branch of law or technical channel to which it belongs, the result, and the document by which it is established. The rows are grouped in four fields: access to justice, twenty-two; economic activities, eighteen; physical integrity, thirteen; and digital, thirty-two. The Court need not read it in order to follow this Complaint: the paragraphs which follow state what it contains. It is annexed so that any single matter may be verified at the point at which it arises, and so that the figure of eighty-five is shown rather than asserted.

**120.** Plaintiff sets out one further matter concerning the thirteen holders identified at Part VI. Each was informed in writing of the federal proceedings then pending and of their subject matter. Each therefore knew that the records requested bore upon facts before a federal court, and that neither producing them nor confirming any suspension of their automatic deletion exposed it to penal and financial consequences of a gravity proportionate to those facts. None derived any advantage from doing so. For a single company, the risk so assumed is already without proportion to what it had to lose. Plaintiff does not claim to know the reason for which thirteen independent operators, several of them competitors of one another, nevertheless assumed it at the same time and in respect of the same person. He states that chance does not account for that repetition, that he has asked each of them to explain it, and that none has done so.

**121.** Plaintiff sets out what each of those holders stood to gain, because the question arises of itself. None was in a commercial dispute with him at the date of his request. The brokerage activity had ceased; the publishing activity does not sell; one provider refunded, unrequested, a fee it was not obliged to refund. Producing a connection log is an automated operation. The records sought are Plaintiff's own data and contain no trade secret. Suspending an automatic deletion costs nothing. Against that, each stood exposed to its supervisory authority, to a pecuniary sanction, and to litigation before a federal court concerning facts of which it had been informed in writing.

**122.** Plaintiff has sought an ordinary explanation before bringing the matter before this Court, and sets out what he found. Administrative inadvertence is the most probable explanation for a single instance; it does not account for ten different mechanisms, a common cause producing a common mechanism, nor for four holders having produced files and then declined to complete them. Cost is excluded by the productions themselves, which issued within days once the decision was taken. Legal caution would have been written down: a holder who fears acting wrongly says so and states a ground, and none has. One holder confirmed in writing that it held the access logs and then took six weeks to furnish them.

**123.** The records Plaintiff seeks are login, session and security records. They are the only documents capable of identifying who held, and when, the information which the events set out at Part IV required in order to be carried out. Those records began not to be produced while Plaintiff was filing before the federal courts of the United States, and they continue not to be produced. Plaintiff does not ask the Court to prefer one explanation to another. He asks for the production of the records which would allow them to be distinguished, and states that none of the thirteen holders has explained why it does not produce them.

**124.** Access to justice, twenty-two mechanisms. Electronic communications received and not registered. Registered items delivered against signature and entered on no docket, with no ground of rejection notified. An incorrect indication as to the availability of legal aid. Incorrect information as to the applicable local rules and as to the position of a person resident abroad. Documents to which Plaintiff is entitled by law and which were not transmitted. A local rule opening the remedy sought, never indicated despite four written requests. A file which no court could locate for one hundred and forty-nine days. A password reset refused upon a condition that presupposes the access it denies. Complaints closed with no notification of the closure. In each instance a reason was stated, and in no two was it the same reason.

**125.** Economic activities, eighteen mechanisms across eight successive activities in unrelated sectors, and belonging to distinct branches of law: insolvency, employment, banking and competition, commercial contract, consumer law, and the law of electronic communications.

**126.** Physical integrity, thirteen mechanisms. Two deprivations of liberty in two countries, neither conforming to the rules applicable to it. Four episodes of abrupt deterioration of health in two distinct configurations in four countries. Two events affecting a motor vehicle, in respect of neither of which any technical diagnosis was furnished. One positive explosive-trace detection at an airport security control.

**127.** Digital, thirty-two mechanisms. The thirteen holders and their mechanisms of non-answer set out at Part VI. The compromise of Plaintiff's accounts. The total loss of mobile service during two journeys undertaken to effect federal filings. And the matters established by Defendants' own files, set out at Part VII.

**128.** The mechanisms do not repeat. Plaintiff pleads that a common ordinary cause produces a common mechanism, and that eighty-five distinct mechanisms, drawn from different branches of law and different technical channels, in more than eight countries, over nine years, are not what a common ordinary cause produces.

**129.** Nor do the actors repeat. No identifiable group recurs among the persons who carried out those steps. The visible actors differ on each occasion, have no relation to one another, and in a number of instances are competitors of one another.

**130.** Plaintiff pleads that the absence of a recurring group among those who carried out the conduct is not inconsistent with the enterprise pleaded at Part V. It is what such an enterprise produces. An association that operates through intermediaries who differ on each occasion does not leave the same group twice. That is why Plaintiff does not allege a horizontal association among the named Defendants, and why the direction of the enterprise is pleaded as Defendants John Does 1-50.

**131.** Plaintiff draws the following inference and no other. Eighty-five distinct mechanisms, in four fields, in more than eight countries, over nine years, produced one result: the activity then being conducted was brought to an end, and Plaintiff was left unable to establish before any tribunal what had occurred.

**132.** Plaintiff does not allege that any of those mechanisms was coordinated with any other, nor that the persons who employed them knew of one another. He alleges that the mechanisms exist, that they are distinct, that they are documented, and that their result is single.

## VII. WHAT THE PRODUCTIONS THEMSELVES ESTABLISH

**133.** Plaintiff does not ask this Court to infer anything from an absence. The matters in this Part are established by files produced by Defendants themselves, in response to Plaintiff's requests.

**134.** On 8 September 2026 one Defendant furnished an archive containing a record of logins and a record of security challenges. Those files record that on 10 July 2025, between 05:47 and 05:59 Coordinated Universal Time, forty-six security challenges were generated in respect of Plaintiff's account from a single Internet Protocol address, of which twenty-six are recorded as blocking challenges; and that at 05:57 a login from that same address

succeeded. The address falls within a range allocated to Iran. Plaintiff was in the United Arab Emirates on that date. He advances no explanation and asserts nothing as to the identity of the person concerned. He states that the record is the Defendant's own.

**135.** Those same files record accesses from a United States address on 29 to 31 July 2025 occurring within the same minutes as a session from the United Arab Emirates, and a login on 4 December 2025 from the address identified at paragraph 96.

**136.** On 7 September 2026 at 07:22 another Defendant confirmed in writing that an account data export includes information relating to the account including IP and access logs. Exports containing authentication records were furnished on 8 September 2026 in respect of both of Plaintiff's accounts. Those records include three accesses, between April and June 2025, from a block of addresses which a public registration lookup attributes to a United States cloud infrastructure provider, and which carry no device identifier. That is the period during which Plaintiff prepared, on that service, the case file underlying his filing in No. 1:25-cv-10163-LTS. Plaintiff does not allege that those accesses were unauthorised and does not exclude an internal processing operation by that Defendant. He states that he has asked and has not been told.

**137.** An account data export produced by one Defendant records three distinct Internet Protocol addresses connected to Plaintiff's account at the same moment, on 2 March 2026 at 08:56 Coordinated Universal Time. A single user cannot be in three places at once. Plaintiff advances no explanation, and states that the record is the Defendant's own and that he has asked for it to be explained.

**138.** On 26 August 2026 a further Defendant furnished seven documents including a security history recording six logins with their addresses and timestamps.

**139.** Plaintiff pleads the foregoing as affirmative matters. The same Defendants who produced those records have declined to state their extent, their recipients and their retention. The refusal is therefore not a refusal to search: it is a refusal to complete a record already begun.

**140.** Three undertakings have acknowledged in writing that access to Plaintiff's data occurred, and each, having so acknowledged, has declined to state its extent. One Defendant's own systems generated a security alert on 26 February 2026 which has not been explained. One Defendant confirmed access to Plaintiff's account on 25 February 2026 and, on 15 April 2026, denied it. The Defendant named at paragraph 23 wrote on 7 August 2025 acknowledging an attack permitting unauthorised access to Plaintiff's civil-status data, contractual data and bank account identifier, and has answered nothing since, notwithstanding requests of 7 August and 24 October 2025.

**141.** A further matter concerns the delivery of electronic messages. In December 2025, while Plaintiff was in New York, a message addressed to him was not received by him. In January 2026 a third party reported to him in writing that the sender had said she received no reply from him, although the reply appears on Plaintiff's own device, bearing its read receipt, and Plaintiff has preserved captures of the thread. Plaintiff does not allege that the message was not delivered to its recipient, and the record on his device does not support such an allegation. He alleges that a message addressed to him in that period did not reach him, and that the account of the exchange given to him by a third party does not correspond to the record he holds.

**142.** Plaintiff records, and states it himself, that a filing he made on 8 July 2026 in No. 1:26-cv-2421 described access to two of his accounts as having been confirmed by the service providers. The sequence set out at paragraph 140 is the fuller and more exact account of that matter, and Plaintiff pleads it in that form. He further accepts, and does not contest, the statement of one Defendant of 11 September 2026 that it does not retain account access logs beyond what its export tool provides, and states that a security alert and an access log are distinct categories.

## VIII. KNOWLEDGE, AND ITS DATE

**143.** On 11 August 2026 Plaintiff addressed to four of the Defendants a signed letter in eight parts, acknowledged or registered by each. It identified by case number the proceedings then pending before the federal courts of the United States; it stated that proceedings are pending in which the Director of the Federal Bureau of Investigation is named, and that Plaintiff has made reports concerning his personal safety to that agency and before the federal courts in Washington; it described the economic scope of the matter without stating any sum; and it recorded the difficulties of access and of procedure as facts, without imputation.

**144.** That letter contained an express section stating what it did not say: that it imputed nothing, sought no sum, alleged no date and drew no conclusion.

**145.** The letter further requested, in terms, that it be forwarded to the Legal Department and the Finance Department of the group parent company, and that Plaintiff be confirmed in writing that the transmission had taken place. No such confirmation has been received from any recipient. The one-month period expired on 11 September 2026.

**146.** Plaintiff does not ask the Court to presume that the transmission took place. He pleads that no Defendant may rely upon an absence of transmission which it itself decided upon after being invited in writing to effect it and to confirm it.

**147.** One further Defendant received two written communications addressed to it directly in the United States: a formal notice of 27 May 2026 to its General Counsel and Legal Department, and a claim of 11 August 2026 to the Office of its Chief Executive Officer, stating a period of twenty-one days. Neither has received a substantive response. In its case the knowledge pleaded in this Part passes through no intermediary and is dated at the level of the company's direction.

**148.** On 13 September 2026 Plaintiff addressed to the remaining Defendants, and to five further holders who are not Defendants, a written notice to preserve records. Each notice identified the three federal proceedings by case number, stated expressly that Plaintiff did not suggest that the recipient was a party, listed seven narrow categories of record, bounded the period at 1 January 2024, and asked that automatic deletion be suspended. Each notice sought no production, asked no question, made no allegation and stated no sum.

**149.** From those dates, no Defendant can maintain that it was unaware that records relating to Plaintiff's accounts bear upon identified federal proceedings. Plaintiff pleads that each Defendant acted, from the date applicable to it, with knowledge of those proceedings and of the bearing of those records upon them.

**150.** Plaintiff further pleads that the obligation to preserve arises in United States law when litigation is pending or reasonably foreseeable, and does not await an order of court. The notices did not create the obligation. They dated the knowledge.

## VIII bis. THE CONTINUING IMPAIRMENT OF AVAILABILITY

**151.** The facts set out in this Complaint begin in 2017. No provider of the kind identified here retains login, session, security and routing records for nine years. Records of that nature are subject to retention schedules and are deleted by the ordinary operation of those schedules rather than by any decision.

**152.** Plaintiff's notices asked, in terms, that automatic deletion, overwriting, purging and anonymisation be suspended in respect of the identified categories for as long as the proceedings continue.

**153.** No Defendant has stated that a suspension has been put in place. No Defendant has stated that it still holds records covering the relevant period. No Defendant has stated that it holds none.

**154.** One matter is not a matter of inference. On 29 July 2026 at 12:20, two days after Plaintiff's request for access of 27 July and while that request was pending, one holder wrote to him in terms which included the confirmation of the deletion of his profile, and the statement that when an account is closed the data are deleted in accordance with its privacy policy. That holder is an entity of a Defendant group. Plaintiff draws two matters from that message and no more: a written and dated confirmation that a deletion had taken place while a request for access was pending, and the acknowledgment that a written retention policy exists and binds its author, since the author relies upon it.

**155.** A second matter is likewise not a matter of inference, and it concerns a loss announced in advance. In answer to a question directed to retention periods, one institution informed Plaintiff that a system holding more than ten years of history was scheduled to be decommissioned. It was one of ten institutions of the same network to which an identical request had been addressed on the same day, and it was the only one to say so. None of the forty-four banking and financial institutions Plaintiff has addressed was asked that question in terms. Plaintiff does not infer from that silence that the others hold no such system: he states that they were not asked.

**156.** Plaintiff draws one matter from that. Where a system is to be decommissioned, migrated, replaced or purged on a known date, the records it holds cease to exist on that date whatever any retention schedule may provide,

and no later order can restore them. Whether any Defendant or third-party holder has such an operation in prospect is known to it alone, and has not been stated to Plaintiff by any of them.

**157.** Plaintiff further states the effect of the two refusals taken together. A holder that does not produce the records leaves Plaintiff unable to know what exists. A holder that does not suspend automatic deletion allows what existed to cease to exist. A holder that does both renders the state of its own records permanently unverifiable, by Plaintiff and by any court. Each of the thirteen holders identified at Part VI has done both.

**158.** Plaintiff does not allege that any record has been destroyed, and does not ask the Court to presume it. He pleads that the state of those records is unknown to him, is known to the Defendants alone, and has not been stated by them despite a written request; and that, if no suspension has been put in place, the availability of those records for use in the identified proceedings has been diminished on every day since the date at which each Defendant acquired the knowledge pleaded in Part VIII.

## IX. THE PATTERN OF RACKETEERING ACTIVITY

**159.** The predicate acts pleaded are those set out at 18 U.S.C. § 1961(1), namely 18 U.S.C. §§ 1512 and 1513.

### A. Section 1512(c)

**160.** In Fischer v. United States, 603 U.S. 480 (2024), the Supreme Court held that 18 U.S.C. § 1512(c)(2) reaches conduct that impairs the availability or integrity of records for use in an official proceeding. Plaintiff pleads under that provision as the Supreme Court has delimited it, and pleads in the alternative under § 1512(c)(1) in respect of any record shown to have been altered, destroyed or concealed.

**161.** Plaintiff pleads this count only as to conduct occurring after the date on which the Defendant concerned acquired the knowledge pleaded in Part VIII, and relies upon the matters pleaded in Part VIII bis.

### B. Section 1513(e)

**162.** 18 U.S.C. § 1513(e) makes it an offence knowingly and with intent to retaliate to take any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer truthful information relating to the commission or possible commission of a federal offence. Section 1513 is a predicate act under § 1961(1), and § 1513(d) expressly provides for extraterritorial federal jurisdiction.

**163.** The disclosures relied upon are the delivery of the complete case file against signature to the New York Field Office of the Federal Bureau of Investigation on 9 December 2025, and the reports concerning Plaintiff's personal safety made to that agency. Both were identified, at its parts 4 and 6, to the four recipients of the letter of 11 August 2026. Plaintiff pleads this count only against those four Defendants and only as to conduct occurring after that date. He states, rather than leaves to be discovered, that the notices of 13 September 2026 identify the federal proceedings but do not identify that disclosure, and that he accordingly does not plead this count against the remaining Defendants. The counts under 18 U.S.C. § 1512 and under 42 U.S.C. § 1985(2) require no such disclosure and are pleaded against all.

### C. Matters reserved

**164.** Plaintiff does not plead 18 U.S.C. §§ 1341 or 1343 in this Complaint. The matters set out at paragraphs 75 and 76, concerning registered items delivered against signature and entered on no docket, are pleaded as facts and not as predicate acts, and Plaintiff makes no allegation of a scheme of misrepresentation against any Defendant.

**165.** Plaintiff makes no allegation against any court, any clerk, any judicial officer or any agency of the United States. Those matters are pleaded as facts and as effects, and the identification of any person responsible for them is a matter for discovery.

## X. INJURY

**166.** Plaintiff pleads injury to his business and property within the meaning of 18 U.S.C. § 1964(c), in the categories directly caused by the conduct of these Defendants, as Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), and Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006), require.

**167.** First, the cost of substitution. Deprived of an aggregator, Plaintiff must himself perform, channel by channel, the distribution, referencing, metadata management and updating that an aggregator performs. That cost is measurable in hours and is documented. Plaintiff does not plead lost sales; there have been none.

**168.** Second, foreclosure of the market for the works. Thirteen distribution channels were stated to have declined the content while four publish the same works under the same ISBN, and one of the channels so named published them upon review. The falsity of the stated ground renders the exclusion attributable.

**169.** Third, the impossibility of establishing whether purchasers presented themselves and, if so, what became of their payments. Plaintiff offers works and other products through the principal distribution platforms, and payment for them passes through a single processor. He does not plead that any sale was prevented. He pleads that the record which would show whether any attempt was made, and what became of it, has been sought item by item and has not been produced, and that the absence of a completed sale is accordingly not an established fact but an unanswered question.

**170.** Fourth, the impairment of the publishing and creative activity itself, which is in distribution and does not sell. Plaintiff pleads no figure and reserves the quantification.

**171.** Fifth, and as the domestic injury required by RJR Nabisco, the impairment of Plaintiff's ability to prosecute proceedings before the federal courts of the United States, including his inability to state to those courts what exists and what does not.

**172.** Plaintiff states one further matter as to the character of the records withheld. In No. 1:26-cv-2421, filed on 8 July 2026, Plaintiff pleaded that access to the inputs upon which entry to the relevant market depended — banking relationships, financing, and data — was controlled by incumbent undertakings, and that the relevant market is the commercial-bank deposit market, of which the United States market is the largest, at approximately 19.4 trillion dollars according to Federal Reserve data of 24 June 2026. The records Defendants hold are within that third category. On 20 July 2026 the competition directorate of the European Commission, summarising this matter in its own terms, connected the impossibility of recovering archival and communications-history data with the failure of that entry.

**173.** Plaintiff pleads that matter as a premise and not as a claim. He does not replead the count brought in No. 1:26-cv-2421, seeks no determination upon it here, and makes no allegation against the defendants to that action. He pleads that the records withheld by these Defendants are not merely evidence of what occurred: they were themselves an input upon which a prepared market entry depended, and their retention is accordingly a direct cause of the injuries set out above rather than a remote one.

**174.** Plaintiff states the character of what is withheld, because it determines the directness of the injury. He conducts substantially the whole of his affairs by electronic means: the preparation of his work, his correspondence, his despatches and their tracking, his appointments and his payments all pass through the systems these Defendants operate. Those systems are not a source of evidence about his activity. They are the medium in which that activity is carried on.

**175.** It follows that the question is not whether a refusal to furnish records is, in itself, an exclusionary practice. Plaintiff does not so contend and pleads no such claim. The question is whether an undertaking whose medium of activity is controlled by others, which can neither rely upon it nor establish what has occurred within it, is in a position to bring a prepared activity to market. Plaintiff pleads that it is not, and that this is so without regard to how the refusal is characterised. It is the same matter as the refusal of a dedicated bank account pleaded at paragraph 64: it was never necessary to establish that refusing an account is an exclusionary practice; it was enough that without the account the transactions could not be executed.

**176.** The second effect is distinct and Plaintiff pleads it separately. A party who cannot establish who has had access to the preparation of his case does not conduct his litigation in the conditions to which a party is entitled. That is not an evidentiary inconvenience. In this matter the litigation is the instrument by which what was destroyed is to be recovered, and an impediment to its preparation is an impediment to the recovery itself.

**177.** Plaintiff states the economic structure within which those injuries arise, so that their direct character is intelligible. The successive activities described at Part IV were intended to finance the banking model. Each activity brought to an end is a source of financing removed from that model, and a delay in the entry of a new competitor

to a market held by established undertakings. Plaintiff pleads that structure as the explanation of the injuries listed above, and not as a separate head of loss.

**178.** Plaintiff pleads no sum. The quantification of loss is reserved to the trier of fact and will follow the production of the records sought in this action. Plaintiff states expressly that he is not presently able to quantify what he has not been permitted to establish.

## XI. CLAIMS FOR RELIEF

**COUNT I. 18 U.S.C. § 1962(c)**

**179.** Defendants, being persons associated with the enterprise described in Part V, conducted or participated in the conduct of its affairs through the pattern of racketeering activity described in Part IX, and Plaintiff was thereby injured in his business and property within the meaning of 18 U.S.C. § 1964(c). Plaintiff pleads the named Defendants as participants in, or instruments of, an enterprise directed from elsewhere, and not as its directors, and pleads Reves v. Ernst & Young, 507 U.S. 170 (1993), accordingly. Treble damages, costs and such fees as are allowed by law are sought.

**COUNT II. 18 U.S.C. § 1962(d)**

**180.** Plaintiff pleads that each Defendant agreed to further the endeavour of the enterprise described at Part V. He does not allege that any Defendant communicated with any other, and does not rely upon any such communication. Under Salinas v. United States, 522 U.S. 52, 63-65 (1997), a defendant need neither commit a predicate act himself nor take part in the operation or management of the enterprise; it is sufficient that he adopt the goal of furthering or facilitating the criminal endeavour. Plaintiff relies for that purpose upon the matters pleaded at Part VIII, by which each Defendant was informed in writing of the proceedings and of the records said to bear upon them, and upon its conduct thereafter. This Count is pleaded in the alternative to Count I and does not depend upon it.

**COUNT III. 18 U.S.C. § 1962(c), predicated on § 1513**

**181.** Plaintiff pleads this Count in the alternative to and independently of Counts I and II, against the four Defendants identified at Part IX and in respect of conduct occurring after 11 August 2026. The disclosure relied upon is that pleaded at Part IX. The harm relied upon is interference with Plaintiff's lawful livelihood, which 18 U.S.C. § 1513(e) names in terms. Plaintiff relies upon 18 U.S.C. § 1513(d), which provides expressly for extraterritorial federal jurisdiction over offences under that section, and states that the conduct complained of is in any event connected to this forum for the reasons set out at Part III.

**COUNT IV. 18 U.S.C. § 1030(g)**

**182.** Plaintiff alleges access to his accounts without authorisation, or in excess of authorisation, occurring after 8 July 2026 and distinct from the facts pleaded in No. 1:26-cv-2421. He relies upon the matters established by Defendants' own records and set out at Part VII, and upon the records whose production is sought, which alone can establish the extent of such access. He pleads loss within the meaning of 18 U.S.C. § 1030(e)(11), comprising the cost of responding to the conduct and of assessing the state of his accounts. Plaintiff states that 18 U.S.C. § 1030 is not among the offences listed at 18 U.S.C. § 1961(1), and that this Count is accordingly pleaded as a free-standing claim and not as a predicate act.

**COUNT V. 42 U.S.C. §§ 1985(2) and 1986**

**183.** Plaintiff pleads, in the alternative to Counts I to III, that two or more persons conspired to injure him in his property on account of his having attended and filed in courts of the United States. The first clause of that provision proscribes two things: deterring a party or witness by force, intimidation or threat, and injuring such a party or witness in his person or property on account of his having attended or testified. Plaintiff pleads the second. No allegation of racial or class-based animus is required in respect of that clause: Kush v. Rutledge, 460 U.S. 719 (1983). Injury within the meaning of that clause is not confined to a constitutionally protected property interest, and third-party interference with a professional relationship suffices: Haddle v. Garrison, 525 U.S. 121, 125-126 (1999). The relationships terminated are those described at Part IV. Plaintiff further pleads 42 U.S.C. § 1986 against any person having knowledge of that conspiracy and the power to prevent it who neglected to do so.

**COUNT VI. Preservation of evidence**

**184.** Plaintiff seeks an order under the Court's inherent authority, the All Writs Act, 28 U.S.C. § 1651, and Rule 27 of the Federal Rules of Civil Procedure, directing Defendants and the third-party holder identified at paragraph 28, to preserve the categories of record described in the notices of 11 August and 13 September 2026, to suspend automatic deletion in respect of them, and to state in writing whether any system, application or database holding such records is the subject of a decommissioning, migration, replacement or purge that is planned or in progress, and if so upon what date. This Count requires no determination upon any other Count and no production of any document. It is the relief Plaintiff seeks first, and, for the reasons set out at Part VIII bis, it is the only relief whose value diminishes with time.

**COUNT VII. Production**

**185.** Plaintiff seeks expedited discovery, upon such conditions as the Court thinks fit, directed to the production, by Defendants and by the third-party holder identified at paragraph 28, of the categories of record described in those notices, to the identification of the recipients of Plaintiff's data, and to the identification of Defendants John Does 1-50.

**Reserved and not pleaded**

**186.** Plaintiff does not plead the Stored Communications Act in this Complaint. Section 2702 prohibits divulgence by a provider and confers no right of access upon a subscriber, and Plaintiff is not presently in possession of any fact establishing a divulgence by any Defendant. Section 2701 does not apply to conduct authorised by the provider of the service concerned. Plaintiff reserves that claim, notes the two-year limitation at 18 U.S.C. § 2707(f), and states that the identity of recipients, sought at Count VII, is the matter that would establish it.

## XII. PRAYER FOR RELIEF

**187.** Plaintiff respectfully requests that the Court: enter an order for the preservation of evidence as described in Count VI; authorise expedited discovery as described in Count VII; enter a protective order and establish a secure channel for the transmission and handling of the documentary record described at paragraph 10; award damages, trebled as provided by 18 U.S.C. § 1964(c), in an amount to be determined by the jury; award costs and such fees as are allowed by law; and grant such other relief as is just. Plaintiff pleads no sum, for the reason stated at paragraph 178.

## XIII. JURY DEMAND

**188.** Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

**189.** Plaintiff records that one Defendant's published terms contain an exclusive forum provision designating a county of the State of Oklahoma and an express waiver of jury trial. The claims pleaded here are not contractual claims, and Plaintiff pleads that the provision does not extend to them. Should the Court hold otherwise, Plaintiff will pursue that Defendant separately in the designated forum and asks that the remainder of this action proceed.

## XIV. WHAT THIS COMPLAINT DOES NOT DO

**190.** Plaintiff presents this Complaint with knowledge of the Memorandum Opinion of 22 June 2026 in No. 1:26-cv-02070. This is a distinct pleading. Its facts are stated in its own text and not by reference to exhibits. It names no foreign state and invokes no exception to the Foreign Sovereign Immunities Act. The basis of jurisdiction over each Defendant is stated at Part II.

**191.** This Complaint does not relitigate any matter pleaded in No. 1:26-cv-2421. It names none of the defendants to that action. No claim pleaded here rests upon any fact occurring before 8 July 2026; earlier facts are pleaded as context only. In No. 1:26-cv-2421 Plaintiff sought protective relief against other defendants and expressly reserved the merits; this action proceeds upon that reservation.

**192.** Plaintiff sets out, so that the position is clear, the relationship between this action and the two matters he has previously brought in this District. In No. 1:26-cv-02070 the Court granted his application to proceed in forma pauperis and dismissed the pleading without prejudice, upon the form of the pleading and not upon its substance; Plaintiff did not appeal and has not reintroduced that pleading. No. 1:26-cv-2421 is brought against sixteen banking institutions, none of which is a Defendant here, and Plaintiff there seeks protective relief while expressly reserving the merits. The present action is brought against different parties, upon facts occurring after 8 July 2026,

and seeks relief which neither of those matters seeks. Plaintiff has at no time reintroduced the same claim against the same parties.

**193.** Plaintiff makes no allegation against any court, any clerk, any judicial officer or any agency of the United States.

**194.** Plaintiff records that letters he addressed to two Defendants on 20 April 2026 described the conduct complained of as coordinated across platforms. That is not what is alleged in this Complaint. Plaintiff alleges a convergence of effects, and expressly does not allege any agreement or communication among the named Defendants.

**195.** Plaintiff alleges no agreement among the named Defendants and imputes no intention to any individual. Where a matter is established by a document not emanating from him, it is stated. Where it is not, it is pleaded on information and belief and identified as such, on the footing that the facts concerned lie within the exclusive knowledge of the Defendants.

**196.** Plaintiff does not seek damages for any injury to his physical integrity, and does not ask the Court to make any finding upon the matters pleaded at paragraphs 67 to 73.

**197.** One third-party holder received from Plaintiff, on 12 September 2026, a written statement that he would not write again to it upon the subject of his request for access. That statement concerned correspondence and not the exercise of a legal remedy, and Plaintiff records it here so that the Court is aware of it from him.

## XV. VERIFICATION

**198.** I, Pierre Olivier Michel Deglaire, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I am the Plaintiff in this action, that I have read the foregoing Complaint, that the factual allegations within my personal knowledge are true and correct, and that those made on information and belief I believe to be true.

Executed on 16 September 2026, at Merignac, France.

Respectfully submitted,



**Pierre Olivier Michel Deglaire, Plaintiff pro se**

7 avenue Guillaume Apollinaire, 33700 Merignac, France

pierre.deglaire@gmail.com — deglaire.aoic@gmail.com